MANNING ENGINEERING, INC., PLAINTIFF-RESPONDENT, v. HUDSON COUNTY PARK COMMISSION AND COUNTY OF HUDSON, DEFENDANT-APPELLANT.

Argued March 22, 1977—Decided July 26, 1977.

114

116

*Mr. Francis P. Morley* argued the cause for appellant (*Mr. Harold J. Ruvoldt, Jr.,* attorney).

*Mr. Michael F. X. Manning* argued the cause for respondent (*Messrs. Keith and Winters,* attorneys).

The opinion of the court was delivered by

PASHMAN, J. Plaintiff commenced this lawsuit to collect the balance of a fee allegedly due for engineering services performed under a contract with the defendants, the Hudson

County Park Commission ("Park Commission") and the County of Hudson ("County"). Following this Court's decision affirming and modifying in part the judgment in favor of plaintiff, *Manning Engineering, Inc. v. Hudson Cty. Park Comm'n and County of Hudson*, 71 *N. J.* 145 (1976), the defendants petitioned to reopen the judgment on the ground that the contract had been awarded to plaintiff in return for certain illegal activities of the president, director and 25% shareholder of that corporation, Frank G. Manning.

Apart from the alleged illegality in the procurement of the contract. the facts surrounding the contract negotiations are fully set forth in our prior decision. As we noted there, the contract in question stemmed from a proposed park development on the Hackensack River in Jersey City. The Park Commission, which was responsible for planning the project, passed a resolution in June 1965 authorizing plaintiff to prepare various plans and specifications and to make surveys for the project. The engineering firm began work immediately. On October 13, 1965, the parties executed a formal contract under which plaintiff agreed to perform such services. The agreement was ratified by a resolution of the County Board of Freeholders on the next day.

Plaintiff received $138,365.00 in payments for services rendered in connection with the project. However, in August 1968 Manning learned that another engineer had been hired to continue work on the development. As a result, he submitted a bill to the Park Commission, demanding payment of the remainder due his firm under the contract, $251,894.10. After instituting suit for this amount, plaintiff recovered a judgment for $134,522.37, plus 6% interest from the date when plaintiff filed his bill with the County. The Appellate Division affirmed and the decision was presented to this Court on petitions for certification by the defendants and cross-petition of the plaintiff. 69 *N. J.* 75 (1975). We affirmed the award of payments under the contract, but modified the lower courts' judgments to delete the award of pre-judgment interest. 71 *N. J.* at 159.

Our decision was announced on September 16, 1976. We were first advised on October 5, 1976 of the illegality in the procurement of the contract. At that time defendants filed a motion seeking to have the prior judgment set aside on the ground that Manning had been awarded the contract in question in return for his role as a conduit for illegal "kickbacks." Counsel for the County argued that defendants first became aware of Manning's role in this illegal scheme upon learning that Manning had revealed his activities in collecting "kickbacks" for John V. Kenny while testifying at the federal "Hudson Eight" trial in 1971.[1] Counsel explained that, although Manning had testified in 1971, the attorney for the County was supplied with a transcript of these proceedings on June 4, 1976, and that this "testimony was not in the possession of the County prior to June [4,] 1976 nor was the defense attorney aware that Frank Manning had testified . . . at any time prior to [that] date."

Since neither this Court nor the lower courts had previously dealt with the question raised in the petition for reopening the judgment, we remanded the case to the trial court to receive evidence and make findings of fact concerning the relationship, if any, between Manning's illegal activities and the award of the contract.[2] The trial court conducted a hear-

[1]Manning was indicted by a federal grand jury, but later testified against his co-defendants, including John V. Kenny, under a grant of immunity. He testified at the trial on June 17, 18, and 21, 1971.

Although John V. Kenny was not a member of the Park Commission, the parties agree that he controlled the award of contracts by that body.

[2]Prior to this belated claim of illegality, the legal issues in the controversy had been framed strictly in terms of contract principles and statutory requirements for municipal projects. Our decision dealt with (1) the applicability of *N. J. S. A.* 40A:4–44 as a bar to enforcement of the contract; (2) the alleged conflict of interest created by Manning's accession to the position of county engineer after January 20, 1966; (3) the meaning of the reference to federal funding in the Freeholders' resolution approving the contract; (4)

ing on this issue and found that Manning's role as a "conduit between the extorters and extortees" was a "significant element" of the consideration for awarding the contract to his engineering firm. As a result, we ordered that the matter be reopened.

## I.

### *AUTHORITY FOR REOPENING THE JUDGMENT*

#### A. *Application of R. 4:50-1*

We are satisfied that authority exists under *R.* 4:50-1 for reopening the judgment in this case.[3] Although defendants applied for this relief two years and seven months after the trial court rendered a judgment in favor of plaintiff, the interests at stake and the truly extraordinary nature of the circumstances presented convince us that relief under the rule is appropriate.

*R.* 4:50-1 allows a court to "relieve a party or his legal representative from a final judgment, order or proceeding" whenever necessary to prevent a manifest denial of justice. The rule is designed to reconcile the strong interests in finality of judgments and judicial efficiency with the equitable notion that courts should have authority to avoid an unjust result in any given case. *Hodgson v. Applegate,* 31 *N. J.* 29, 43 (1959) ; *Scheck v. Houdaille Con-*

the services for which plaintiff could recover under the contract; and (5) the propriety of awarding prejudgment interest from the date of plaintiff's final, formal voucher for the claimed amount due.

[3]Defendants petitioned both for a rehearing and to reopen the judgment. Although they cite *R.* 2:11-6 in support of their application, this appears limited to their plea to have the Court reconsider its interpretation of *N. J. S. A.* 40A:4-44. Since we limited consideration to allegations that the contract was obtained in exchange for illegal services, we need not concern ourselves with *R.* 2:11-6. Though not explicitly stated in defendants' petition, the rule governing this request is *R.* 4:50. In the interests of a "just determination," *R.* 1:1-2, we shall treat its application to reopen the judgment under this provision.

*struction Materials, Inc.,* 121 *N. J. Super.* 335, 345 (Law Div. 1972).

█ Specifically, subdivision (b) of the rule provides for relief whenever there is "newly discovered evidence which would probably alter the judgment, order or proceeding and which by due diligence could not have been discovered in time to move for a new trial under *R.* 4:49" ;[4] subdivision (f) applies where there is "any other reason justifying relief from the operation of the judgment or order." The only limitation under the rule is expressed in *R.* 4:50–2, which states that a motion for such relief "shall be made within a reasonable time, and for reasons (a), (b) and (c) of *R.* 4:50–1 not more than one year after the judgment, order or proceeding was entered or taken." Thus, the one-year limitation applicable to subsection (b) of the rule does not apply to subsection (f), and relief pursuant to that section need only be made "within a reasonable time." *Palko v. Palko,* 73 *N. J.* 395, 401 (1977).

It is clear that subdivision (b), standing alone, does not provide a sufficient basis for reopening the judgment in this case. While that section is addressed to the situation where newly discovered evidence is presented after a judgment has been rendered, it is limited by the one-year limitation embodied in *R.* 4:50–2. It also requires that the evidence upon which reopening is sought be such that it could not have been discovered "by due diligence" in time to move for a new trial under *R.* 4:49. In the instant case, we entertain serious doubts as to whether defense counsel's conduct satisfied the demands of this section. Counsel readily admitted at oral argument that Manning's testimony at the 1971 Hudson Eight trial was widely publicized. He even commented that he didn't "think anybody could have existed in Hudson County in 1971 and not known from headlines in the paper that Manning was

---

[4]*R.* 4:49 provides for a new trial where evidence is discovered and presented to the trial court within ten days after entry of a judgment.

testifying before the federal court at that time." While conceding his general awareness of Manning's role in collecting money for various Jersey City officials, counsel insisted he did not know until June 1976 that Manning had been awarded the contract in question in return for this illegal activity. He asserted that Manning's testimony had been brought to his attention for the first time by a member of the Attorney General's office with whom he had been working for some time. When asked why he failed to come forward with this information in June while the matter was still pending before this Court, he responded that he was prevented from doing so by his heavy case load at that time.

Nevertheless, we conclude that relief should be available under subsection (f) of the rule. This section is considerably broader in scope than the former provision. We have repeatedly noted the broad parameters of a court's discretion under subsection (f), and that a court should have authority under it to reopen a judgment where such relief is necessary to achieve a fair and just result. As we stated in *Court Invest. Co. v. Perillo,* 48 *N. J.* 334 (1966):

Such a motion under (f) is addressed to the discretion of the trial court. That discretion is a broad one to be exercised according to equitable principles, and the decision reached by the trial court will be accepted by an appellate tribunal in the absence of an abuse of its discretion. No categorization can be made of the situations which would warrant redress under *subsection* (f). As Justice Proctor noted in *Hodgson v. Applegate*, 31 *N. J.* 29, 41 (1959), the very essence of (f) is its capacity for relief in exceptional situations. And in such exceptional cases its boundaries are as expansive as the need to achieve equity and justice.
[48 *N. J.* at 341]

*See also Palko v. Palko, supra.*

However, subsection (f) should not be taken as a way of circumventing the more stringent requirements of subsection (b); it should be available only where truly exceptional circumstances are present. Thus, it has been stated, both under *R.* 4:50–1(f) and the identical federal rule, *F. R.* 60(b)

(6), that relief may be granted only where the court is presented with a reason not included among any of the reasons subject to the one-year limitation, including "newly discovered evidence." *See Doyle v. Chase Manhattan Bank*, 80 *N. J. Super.* 105, 125 (App. Div.), certif. den. 40 *N. J.* 508 (1963) (*R.* 4:50–1); *Ackermann v. United States*, 340 *U. S.* 193, 71 *S. Ct.* 209, 95 *L. Ed.* 207 (1950) (*F.R.* 60(b)).

 We are convinced that the circumstances in this case warrant relief under subsection (f); the importance of preventing a fraud upon the public certainly must serve to distinguish this case from others which might arise involving newly discovered evidence under subsection (b). Chief Justice Vanderbilt underscored the independent duty of a court in ruling on a public contract in *Driscoll v. Burlington-Bristol Bridge Co.*, 8 *N. J.* 433 (1952), *cert.* den. 344 *U. S.* 838, 73 *S. Ct.* 25, 97 *L. Ed.* 652, *reh.* den. 344 *U. S.* 888, 73 *S. Ct.* 181, 97 *L. Ed.* 687 (1952), when he said:

When public officials do not . . . conduct themselves and discharge their duties [in a way which is impervious to corrupting influences], their actions are inimical to and inconsistent with the public interest, and not only are they individually deserving of censure and reproach but the transactions which they have entered into are contrary to public policy, illegal and should be set aside to the fullest extent possible consistent with protecting the rights of innocent parties.

[8 *N. J.* at 475]

We must be all the more concerned with such transactions when, as here, it is this Court itself which is responsible for enforcing, albeit unknowingly, such a corrupt and illegal agreement.

While there is a strong likelihood that the critical evidence in this case could have been brought forward earlier had counsel exercised "due diligence," that fact alone should not foreclose the Court from reopening the judgment. Our primary concern here is not with the conduct of counsel, but with ensuring that the public entities which he represents and the

taxpayers whose interests they serve are not deprived of a just determination.

Even where a lawyer was not representing a public entity, courts have found that resort to the analogous provision in *F.R.* 60(b)(6) was permissible where counsel's behavior was so grossly negligent that a client did not have a chance to fairly litigate the issues underlying a judgment. *See Klapprott v. United States,* 335 *U. S.* 601, 613–14, 69 *S. Ct.* 384, 389–390, 93 *L. Ed.* 266, 276–77 (1949) (Black, Douglas, JJ., separate opinion), modified 336 *U. S.* 942, 69 *S. Ct.* 398, 93 *L. Ed.* 1099 (1949); *Chief Freight Lines Co. v. Local Union No. 886,* 514 *F.* 2d 572, 576–77 (10 Cir. 1975); *Steuart, Inc. v. Matthews,* 117 *U. S. App. D. C.* 279, 329 *F.* 2d 234, 235–36 (1964), *cert.* den. 379 *U. S.* 824, 85 *S. Ct.* 50, 13 *L. Ed.* 2d 35 (1964); *Barber v. Turberville,* 94 *U. S. App. D. C.* 335, 218 *F.* 2d 34 (1954); *King v. Mordowanec,* 46 *F.R.D.* 474, 477–78 (D. R. I. 1969); *Lucas v. City of Juneau,* 20 *F. R. D.* 407, 410–11, 17 *Alaska* 75 (D. Alaska 1957); *In re Cremidas' Estate,* 14 *F. R. D.* 15, 17, 14 *Alaska* 234 (D. Alaska 1953); 7 *Moore's, Federal Practice* ¶ 60.27[2] at 365–69 (1975). *But see Cline v. Hoogland,* 518 *F.* 2d 776, 778 (8 Cir. 1975).

Defendants' conduct in this case, in holding back their defense of illegality through several years of litigation in the Law Division, Appellate Division and Supreme Court, and advancing it on a motion to reopen the judgment only after finally losing their appeals based on other defenses, constitutes, in our opinion a rank abuse of the judicial process of this State and deserves the severest condemnation. It is simply incredible that all or most of the members of the Board of Freeholders and the Park Commission, and their attorneys, did not know of that well publicized testimony all during this litigation. Counsel's petition to reopen the judgment stated that he had not been aware that Manning testified, see *ante* at 119. This is contradicted by his statements at oral argument. See *ante* at 122.

In any event, since we find that reopening the judgment under R. 4:50–1(f) in this case is warranted because of the public policy to prevent recovery of damages for breach of an illegal public contract executed by plaintiff as part of a fraudulent scheme, we need not decide whether counsel's conduct, standing alone, would have satisfied the requirement of "exceptional circumstances" implicit in R. 4:50–1(f).[5]

B. *Factual Basis for Reopening the Judgment*

■ The trial court's findings clearly indicate the propriety of reopening the judgment in this case. Both the circumstances surrounding the award of the contract to Manning and his own testimony in the "Hudson Eight" case support the trial judge's finding that Manning received the park project in return for his faithful service to John V. Kenny, former Mayor of Jersey City, as a conduit for illegal kickbacks. While the trial judge found that Manning's role in this

---

[5]The rule suggested in the above cases appears to create a conflict with R. 4:50–1(a), which allows a court to reopen a judgment where there is a showing of "excusable neglect." As Professor Moore has explained in referring to F. R. 60(b)(1):

the wording of Rule 60(b) puts the court in a dilemma. The question presented on the motion is whether the conduct is excusable neglect. Obviously the greater the negligence involved, or the more willful the conduct, the less "excusable" it is; on the other hand, the more inexcusable it is, the greater the natural sympathy with the ultimate victim. Some courts have resolved this dilemma by treating "gross" negligence by counsel as constituting special circumstances taking the case out of subdivision (b)(1), and affording relief under (b)(6).

[*Moore's, Feedral Practice, supra,*
at 366; footnotes omitted]

Other courts have apparently focused upon whether the negligence of the attorney could have been attributable to the client, or acquiesced in by him. *See Link v. Wabash Railroad,* 370 *U. S.* 626, 82 *S. Ct.* 1386, 8 *L. Ed.* 2d 734 (1962) (although not specifically dealing with *F. R.* 60(b)(6), emphasizing the client's role in selecting the lawyer) ; *United States v. Manos,* 56 *F. R. D.* 655, 660 (S. D. Ohio 1972) (length of time elapsed since judgment rendered). Here, no such finding is possible since counsel, in effect, represented the public interest.

illegal scheme may not have been the sole consideration for the contract, his finding that it was "a significant element" is sufficient to warrant reopening the judgment.

Manning was the main witness at the hearing upon remand. He testified freely as to his role in retrieving illegal kickbacks for John V. Kenny; he characterized himself as "the channel through which [contractors] made their payoffs on all of their contracts," or alternatively, as a messenger, collector, or an "intermediary between the extorters and the extortees." In particular, he admitted, both in the hearing upon remand and in the "Hudson Eight" trial, that he had been involved in extorting payments in return for contracts from Gerard Engineering Inc. from June 1964 until 1968. In addition to collecting the kickbacks from this firm, he also relayed Kenny's demand that it pay 20% on the first three contracts and 10% thereafter. The trial judge summarized Manning's involvement in the scheme as follows:

During the week beginning on Monday, June 22, 1964, Manning picked up $4,800 from James Dolan of Gerard Engineering Inc. and delivered it to John V. Kenny. The delivery was made in an office on the first floor of Pollack Hospital in Jersey City. It was split into two parts. In the presence of Manning, Kenny delivered one envelope to Thomas Flaherty, President of the City Council, who had been called to the office and was told it was from Gerard Engineering Inc. This is the first time Frank Manning admits having picked up kickback money from a contractor and delivering it to John V. Kenny. Thereafter he continued to pick up kickbacks from Gerard until the end of 1968.

In spite of his admitted participation in the kickback scheme, Manning contended that there was no relationship between the role he played in picking up payments and the fact that Kenny arranged for him to receive the Park Commission project. He argued before the trial judge that he and Kenny had helped each other because of a mutual admiration. In discussing why John V. Kenny had made certain that he received the park project, Manning explained:

I felt that there was a mutual likeness for one another. It was a deep friendship. I benefitted from it, from many contracts, a total

of ten contracts, with never a question about any kickback from me. I had done lots of work privately for him before that and I felt that I merited his high regard, because of the manner in which I performed many services for him. It wasn't a one-way street at all as far as favors went.

Later in the proceedings, Manning testified that Kenny had thought of him as being a member of the "official family," and therefore immune from having to make campaign contributions or pay kickbacks personally.

Manning's testimony at the "Hudson Eight" trial, however, belies his contention that he was awarded the park contract because of Kenny's "high regard" for him. During that trial he was questioned extensively about his participation in this scheme; his answers clearly demonstrated the connection between the award of the park contract and his role as a "bag man":

Q Now you have told us, Mr. Manning, of picking up these envelopes from the various contracting firms. Did you keep any of the money personally for yourself?
A Never.
Q What, if anything, did you receive for performing this function?
A I received three engineering contracts.
Q During what period of time?
A In the fall of 1964 I received the Food Center Market contract through Bill Sternkopf. In the summer of 1965 I received a small job, a new County road extension from Mr. Sternkopf. In October of 1965 I solicited a job myself. I asked with Jack Kenny, John J. Kenny — we asked Mayor Kenny for a job for me for the Hudson County Park Commission, later known as the golf course site.
Q Did you receive that contract?
A I received all three contracts, yes, sir.

At the hearing below, Manning attempted to convince the trial judge that he had not interpreted the word "function" in this colloquy to refer to his role in collecting the kickbacks. After being asked how he had interpreted the word "function" when giving the above answers, he explained:

I have indicated what I — my function was for my personal knowledge to show the power of Kenny. I had just completed on the preceding page showing the power of Kenny in cancelling out the wishes of the Mayor and the president of the Council who wanted Mayo & Lynch for a 40 million dollar job with five to seven million dollars in fees. And I had finished that part of it and I had the function of showing my personal knowledge that Kenny could award any contract and was the one who awarded contracts. So in response to that question, I interpreted the intent of it to show the power. I had just finished on the City level. I was demonstrating here are three jobs we got within the indictment period on the County level through the power of Kenny.

We agree with the trial judge's conclusion that this answer was "pure sophistry" and that his prior answer, "I received three engineering contracts," was a "direct and concise" response to a "crystal clear" question.

Furthermore, the trial judge's conclusion that Manning had received the Park Commission contract in return for his participation in the kickback scheme is amply supported by other testimony given by him during the "Hudson Eight" trial. During a series of questions dealing with Manning's role in the kickback scheme, the following exchange took place:

Q By the way, what was in all of this for Francis Gerard Manning?
A For Francis —
Q Did you get anything out of it?
A For Francis Gerard Manning there was a continuation with a job in which he was well pleased and wanted to remain, and there was also the prospect of getting private work from time to time to supplement outside private work which I had.
Q Private work from whom?
A From John V. Kenny.
Q Mr. Kenny was going to enable Francis Gerard Manning to get outside private work, is that what you are telling us?
A No, sir. I said — this is not what I said. I said get private work for myself from John V. Kenny to supplement other private work I was doing.
Q And Manning Engineering Company in 1965 up through 1968 was beginning to do quite a bit of work for the County of Hudson — Strike that — for the Hudson County Park Commission, wasn't it?
A Yes, sir.

And when asked why he continued making these collections, he gave similar responses:

A I liked my job and I liked the prospect of getting private work, and I did get private work.
Q So that you are telling us that there was something in it for Francis Gerard Manning?
A Only what would be legitimate.
Q Legitimate private work such as the Hudson County Park Commission work?
A Positively.

\* \* \* \* \* \* \* \*

Q There was something in this running around and collecting of money which you did not like for Francis Gerard Manning, wasn't there?
A There was, yes.
Q You told us two things: Private work, such as the Hudson County Park Commission; is that right?
A Yes.
Q And the fact that you liked your job?
A Yes.

Manning made one further attempt to justify Kenny's intervention in his behalf over the park contract. During his testimony upon remand, he argued that the contract had been awarded to him in exchange for his decision to accept a position as County Engineer. Manning asserted that John J. Kenny had wanted him to accept that position and in order to convince him to do so, he assured Manning that he would help him obtain private work. Manning testified that he agreed to take the County position, which offered a smaller pension, only because John V. Kenny also asked him to accept the position *and* promised that he would obtain the park contract. But, as the trial judge noted, Manning's own testimony confirms that John J. Kenny did not ask him to assume the County Engineer position until October 1965 — four months after the approval of the Park Commission resolution authorizing him to begin work on the project.

Finally, we find little support for Manning's position in the fact that he was eventually removed from the park

contract. Manning argued that since he was replaced in the Park Commission project only three months after resuming his role in collecting kickbacks, this proves that the contract had not been awarded because of these illegal activities. We find the trial judge's explanation of these facts to be far more persuasive. He explained that Manning's argument

overlooks the fact that a split had developed between John V. Kenny and John J. Kenny and Manning had apparently taken over handling the County kickbacks from John J. Kenny. It is more probable that Manning Engineering lost the contract to Camparetto & Kenny as a result of incurring John J. Kenny's ire. It was he who was in control of the County and he had now split with John V. Kenny.[6]

The trial judge also theorized that Manning might have lost the contract because he was not contributing anything to the upcoming mayoral election from his fees.

We are satisfied that this evidence amply supports the trial judge's finding that Manning's role as the "conduit between the extortors and extortees" was a "significant element" of the consideration for being awarded the contract in question. Manning's own testimony in federal court is sufficient to label him a willing participant in a scheme of illegal activities which was designed to defraud the public; it leaves little doubt that he received the public contract in question in return for his service to Kenny. We also reject Manning's belated attempt to minimize his involvement by arguing that he occupied a minor role in this cast of corrupt and immoral public figures. In fact, his own ex-

---

[6]John J. Kenny was County Freeholder and County Chairman of the controlling political party. The trial judge below explained that John J. had controlled everything for John V. until

[a] split developed between [them] in 1968. In March or April of that year, John V. Kenny asked Manning to 'handle it.' This meant that he should begin receiving the kickbacks from the contractors doing business with the County Engineer's Office and delivering those to John V. Kenny. Manning was asked to handle this until John J. Kenny got 'straightened out.'

planations are more than sufficient to establish that he was a *key* figure in this scheme: not only did he act as a conduit for the illegal kickbacks, but he also was responsible for transmitting Kenny's demands to contractors, and at least in one instance, he was responsible for negotiating the amount of the kickback.

Accordingly, we reject plaintiff's assertion that the trial judge's findings are against the weight of the evidence and conclude that reopening the judgment was proper under the circumstances.[7]

## II.

### USE OF MANNING'S
### FEDERAL COMPELLED TESTIMONY

██ Plaintiff argues that the trial court below impermissibly relied upon his testimony in the federal "Hudson Eight" case in concluding that the contract was awarded to him in return for his role in collecting illegal kickbacks. He contends that such use of his testimony constitutes a violation of the transactional immunity conferred upon him by federal officials pursuant[8] to 18 *U. S. C.* § 2514. We disagree.

The federal immunity statute under which Manning was compelled to testify, 18 *U. S. C.* § 2514, provides that a witness compelled to testify under a grant of immunity

shall not be excused from testifying or from producing books, papers, or other evidence on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a

---

[7]Plaintiff's assertion that this result is barred by due process principles is frivolous.

[8]Additionally, plaintiff argues that the introduction of Manning's federal testimony violated *Evid. R.* 20, prohibiting counsel from impeaching his own witness. This argument has no merit since the testimony was introduced not for impeachment purposes, but as substantive evidence in the case. See *Evid. R.* 63(7); *Stoelting v. Hauck*, 32 *N. J.* 87, 106 (1960).

penalty or forfeiture. No such witness shall be prosecuted or subjected to any penalty or forfeiture for or an account of any transaction, matter or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding . . . against him in any court.

It is settled that the guarantees extended to a witness under this section must offer protections which are co-extensive with those implicit in the Fifth Amendment privilege against self-incrimination. *See Kastigar v. United States,* 406 *U. S.* 441, 92 *S. Ct.* 1653, 32 *L. Ed.* 2d 212 (1972), *reh.* den. 408 *U. S.* 931, 92 *S. Ct.* 2478, 33 *L. Ed.* 2d 345 (1972); *Murphy v. Waterfront Commission,* 378 *U. S.* 52, 84 *S. Ct.* 1594, 12 *L. Ed.* 2d 678 (1964); *Counselman v. Hitchcock,* 142 *U. S.* 547, 12 *S. Ct.* 195, 35 *L. Ed.* 1110 (1892). Nevertheless, the privilege against self-incrimination has never been held to protect against "all potential opprobrium, penalties or disabilities which occur as a consequence of the compelled disclosures." *In re Daley,* 549 *F.* 2d 469, 474 (7 Cir. 1977). While courts have refused to adhere to any strict denomination of an action as "criminal" or "civil" in safeguarding constitutional rights, *see In re Gault,* 387 *U. S.* 1, 50, 87 *S. Ct.* 1428, 18 *L. Ed.* 2d 527 (1967); *In re Daley, supra; United States v. Blank,* 261 *F. Supp.* 180 (N. D. Ohio 1966), Clark, "Civil and Criminal Penalties and Forfeitures: Framework for Constitutional Analysis," 60 *Minn. L. Rev.* 379 (1976), it has generally been held that the protections of the privilege extend only to criminal or quasi-criminal sanctions.[9] Numerous

---

[9]Although Manning made no attempt to assert the privilege in the hearing below, had he done so this might have affected his right to recover under the contract. This term the United States Supreme Court expressed the test governing applicability of the privilege as "whether the testimony might later subject the witness to *criminal* prosecution," *Lefkowitz v. Cunningham,* —— U. S. ——, ——, 97 S. Ct. 2132, 2136, 53 L. Ed. 1 (1977) (emphasis added). Other courts have held that there is no right to assert the privilege in a proceeding where there is no threat of future criminal prosecution,

decisions of the United States Supreme Court confirm this interpretation of the privilege. In *Ullmann v. United States,* 350 *U. S.* 422, 76 *S. Ct.* 497, 100 *L. Ed.* 511 (1956), the Court stated that the privilege's "sole concern" is with " 'penalties affixed to the criminal acts . . .,' " quoting *Boyd v. United States,* 116 *U. S.* 616, 634, 6 *S. Ct.* 524, 29 *L. Ed.* 746 (1886). This same passage was quoted in *Kastigar v. United States, supra,* in support of its holding that a federal immunity statute which "cannot lead to the infliction of *criminal penalties* on the witness" was constitutional. 406 *U. S.* at 453; 32 *L. Ed.* 2d at 222 (emphasis added). And in *Gardner v. Broderick,* 392 *U. S.* 273, 88 *S. Ct.* 1913, 20 *L. Ed.* 2d 1082 (1968), the Court stated:

> Answers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a *criminal prosecution* against the person testifying.
>
> [392 *U. S.* at 276, 88 *S. Ct.* at 1915, 20 *L. Ed.* 2d at 1085; emphasis added]

*See also Murphy v. Waterfront Comm'n, supra,* 378 *U. S.* at 79, 84 *S. Ct.* at 1609, 12 *L. Ed.* 2d at 695; *Knapp v. Schweitzer,* 357 *U. S.* 371, 380, 78 *S. Ct.* 1302, 2 *L. Ed.* 2d 1393, 1401 (1958).

■ Although the federal immunity statute refers to "penalties" or "forfeitures" in delineating the scope of the

---

*See, e. g., Costanza, Jr., v. Costanza,* 66 *N. J.* 63, 67 (1974) (distinguishing civil claim for money damages from proceeding with criminal consequences) ; cases cited in McCormick, *Evidence* (2 ed. 1972), § 121 at 257 (noting that "There has never been any serious doubt that the danger of incurring ordinary civil liability for compensatory damages did not bring a situation within the privilege") and 8 Wigmore, *Evidence* (1961 ed.), § 2254 at 331. Where the privilege has been erroneously asserted in a civil proceeding by a plaintiff in that action, various courts have denied recovery. *See, e. g., Mahne v. Mahne,* 66 *N. J.* 53, 58–59 (1974) (dictum) ; *Christensen v. Christensen,* 281 *Minn.* 517, 162 *N. W.* 2d 194, 204 (1968) ; *Levine v. Bornstein,* 13 *Misc.* 2d 161, 174 *N. Y. S.* 2d 574, aff'd 6 *N. Y.* 2d 892, 190 *N. Y. S.* 2d 702, 160 *N. E.* 2d 921 (1958) ; Annot., 4 *A. L. R.* 3d 545 (1965).

protection afforded by that provision, its protections are no greater than those provided by the privilege. It has generally been asserted that these terms refer only to suits in which the government is attempting to impose liability for certain criminal acts, *In re Daley,* 549 *F.* 2d at 470,[10] and not where it is seeking to effectuate some public policy apart from the criminal laws. *See Amato v. Porter,* 157 *F.* 2d 719, 721 (10 Cir. 1946), *cert.* den. 329 *U. S.* 812, 67 *S. Ct.* 635, 91 *L. Ed.* 693 (1947); McCormick, *Evidence* (2 ed. 1972), § 121 at 257–58. Accordingly, referring to 18 *U. S. C.* § 3486, which also prevents a witness from being subjected "to any penalty or forfeiture," the Court in *Ullmann v. United States, supra,* stated:

We are not dealing here with one of the vague, undefinable, admonitory provisions of the Constitution whose scope is inevitably addressed to changing circumstances. * * * For the history of the privilege established not only that it is not to be interpreted literally, but also that its sole concern is, as its name indicates, with the danger to a witness forced to give testimony leading to the infliction of 'penalties affixed to the criminal acts . . .' * * * Immunity displaces the danger. Once the reason for privilege ceases, the privilege ceases.

[350 *U. S.* at 438–39, 76 *S. Ct.* at 506, 100 *L. Ed.* at 525; footnote and citations omitted][11]

---

[10] In *In re Daley, supra,* the court noted that a proceeding could not be categorized as civil or criminal solely by virtue of the evidence which was utilized in the proceeding. The court noted that in the context of the proceedings there:

Although conduct which could form the basis for a criminal prosecution might also underlie the institution of disciplinary proceedings, the focus is upon gauging an individual's character and fitness, and not upon adjudging the criminality of his prior acts or inflicting punishment for them.

[549 *F.* 2d at 474]

[11] Significantly, Justice Douglas and Black argued in dissent that no grant of immunity could be constitutional, since it could not guard against various, non-criminal, disabilities which might arise upon compelling a person to give testimony. Apparently, the majority refused to accept the dissent's conclusion that such disabilities, including disqualification from federal employment, amounted

■ In the instant case we hold that the present action is not one involving a penalty or forfeiture. Although there has been scholarly criticism of attempts by the government to avoid constitutional constraints by affixing "civil" liability for various acts, *see, e. g.,* Clark, *supra,* Note, "Supreme Court Upholds Forfeiture of Innocent Owner's Property Without Prior Notice and Hearing," 60 *Cornell L. Rev.* 467 (1975), Note, "Forfeitures — Civil or Criminal," 43 *Temple L. Q.* 191 (1970), that concern is simply inapposite to the instant suit. For instance, it has been recognized that where the government sues on a contract in behalf of private persons, or in its proprietary capacity, the suit is compensatory, as opposed to punitive in nature. *See* Clark, *supra,* 60 *Minn. L. Rev.* at 472. This is true where the government is seeking liquidated damages, *Rex Trailer Co. v. United States,* 350 *U. S.* 148, 151, 76 *S. Ct.* 219, 100 *L. Ed.* 149, 154 (1956), or even where it is attempting to impose a civil penalty for presenting fraudulent claims to the government. *United States ex rel. Marcus v. Hess,* 317 *U. S.* 537, 63 *S. Ct.* 379, 87 *L. Ed.* 443 (1942). In a case such as this, where the government is merely interposing a defense to an affirmative claim for damages under a contract, the suit is clearly of a non-criminal nature. Significantly, the instant suit was brought by Manning himself as a way of enforcing payment of the fruits of his illegal bargain. It is clearly not one in which the State is seeking to affix criminal liability or to punish Manning for his involvement in the kickback scheme.

■ In determining whether immunized testimony is admissible, this same distinction must be drawn between "proceedings instituted for the purpose of declaring the forfeiture of a man's property *by reason of offences committed by him.'* " *United States v. U. S. Coin & Currency,* 401 *U. S.* 715, 718, 91 *S. Ct.* 1041, 1045, 28 *L. Ed.* 2d 434,

to a forfeiture within the meaning of the privilege against self-incrimination. *See* 350 *U. S.* at 440, 76 *S. Ct.* 497 (Douglas, Black, JJ., dissenting).

437 (1971), quoting with emphasis *Boyd v. United States,
supra,* 116 *U. S.* at 634, 6 *S. Ct.* at 534, 29 *L. Ed.* at 752,
and those actions which are instituted for some reason other
than to punish the person who was compelled to give the
testimony. For instance, a bar disciplinary hearing, although
it may deprive an attorney of his means of livelihood, does
not entail a forfeiture or penalty. *See, e. g., In re Daley,
supra; Maryland State Bar Association, Inc. v. Sugarman,*
273 *Md.* 306, 329 *A.* 2d 1 (1974); *cert.* den. 420 *U. S.*
974, 95 *S. Ct.* 1397, 43 *L. Ed.* 2d 654 (1975); *Annot.,*
"Use in Disbarment Proceeding of Testimony Given By
Attorney in Criminal Proceeding Under Grant of Immu-
nity," 62 *A. L. R.* 3d 1145 (1975). The primary purpose
of such proceedings is not to punish, but to protect the
public. Hence the courts have been willing to allow im-
munized testimony of an attorney, as well as other licensed
persons in similar proceedings, to be introduced in subse-
quent disciplinary proceedings over objections that such use
violated the privilege. *See Daley, supra; Napolitano v. Ward,*
457 *F.* 2d 279 (7 Cir.), *cert.* den. 409 *U. S.* 1037, 93
*S. Ct.* 512, 34 *L. Ed.* 2d 486 (1972) (judge); *Childs v.
McCord,* 420 *F. Supp.* 428 (D. Md. 1976) (professional en-
gineer); *In re Colacasides,* 6 *Mich. App.* 298, 148 *N. W.*
2d 898 (1967) (license to run restaurant and serve alcoholic
beverages); *Annot., supra.*[12]

---

[12]Plaintiff erroneously relies upon *Lefkowitz v. Turley,* 414 *U. S.*
70, 94 *S. Ct.* 316, 38 *L. Ed.* 2d 274 (1973); *Gardner v. Broderick,
supra; Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanita-
tion,* 392 *U. S.* 280, 88 *S. Ct.* 1917, 20 *L. Ed.* 2d 1089 (1968); and
*Spevack v. Klein,* 385 *U. S.* 511, 87 *S. Ct.* 625, 17 *L. Ed.* 2d 574
(1967). However, these cases hold merely that a witness may not
be coerced into waiving immunity. *See also Lefkowitz v. Cunning-
ham, supra.* Thus, as the court explained in *Childs v. McCord, supra,*
when faced with a similar argument, compelled testimony may be
used in a civil proceeding as long as the witness has been given
immunity from having it used against him in a criminal prosecution.
420 *F. Supp.* at 436. *See also, In re Colacasides, supra,* 148 *N. W.*
2d at 901.

Similarly, immunized testimony was held admissible in *United States v. Cappetto,* 502 *F.* 2d 1351 (7 Cir. 1974), *cert.* den. 420 *U. S.* 925, 95 *S. Ct.* 1121, 43 *L. Ed.* 2d 395 (1975). There the federal government instituted proceedings under 18 *U. S. C.* § 1964. That provision allows the government to institute a civil action in which equitable remedies can be granted as a way of enforcing the anti-racketeering provisions of the Organized Crime Control Act of 1970, 18 *U. S. C.* § 1962. Defendants were given immunity in the suit and ordered to testify. After refusing to do so, contempt proceedings were instituted. Upon appeal, the court held that the particular action was civil in nature and, as a result, they could be compelled to testify even though their immunized testimony was to be used in a civil proceeding in which the government was seeking to obtain an injunction against various illegal gambling activities. Referring to the use immunity provided by 18 *U. S. C.* §§ 6002, 6003, the court held:

The immunity granted is co-extensive with the privilege against self-incrimination, . . . and therefore may be invoked only against criminal proceedings. Accordingly, testimony given by a party in a civil case under a grant of immunity may be used against that party in that case, although it cannot be used in any criminal proceeding against him.

[502 *F.* 2d at 1359]

We conclude, analogously, that testimony compelled under a grant of immunity in a criminal case should be admissible against that party in a wholly civil proceeding not involving sanctions for criminal activity. The instant case certainly falls within the latter category; as we stated above, our primary purpose in reopening the judgment in this case is to protect the public from fraudulent practices connected with the procurement of public contracts. See *ante* at 123. Consequently, we hold that Manning's immunized testimony is admissible in the instant proceeding.

## III.

*DAMAGES FOR BREACH OF THE CONTRACT*

Having determined that the judgment should be reopened, we now turn our attention to defendants' argument that plaintiff should be denied recovery under the contract.

 The general rule is that damages for breach of an illegal public contract will be denied, regardless of whether it is sought under a contract or *quantum meruit* theory.[13] *S. T. Grand, Inc. v. City of New York,* 32 *N. Y.* 2d 300, 344 *N. Y. S.* 2d 938, 298 *N. E.* 2d 105 (1973); *Jered Contracting Corp. v. New York City Transit Authority,* 22 *N. Y.* 2d 187, 292 *N. Y. S.* 2d 98, 239 *N. E.* 2d 197 (1968); Williston, *Contracts* (3 ed. 1972), § 1786A at 343. Similarly, a contract is also unenforceable where it is held to be contrary to public policy. *Driscoll v. Burlington-Bristol Bridge Co., supra; Cameron v. International, Union No.* 384, 118 *N. J. Eq.* 11, 23 (E. & A. 1935).

In *S. T. Grand, Inc. v. City of New York, supra,* the plaintiff entered into a contract with the City of New York for the cleaning of a city reservoir. After performing the contract, plaintiff was convicted in federal court of conspiring to use interstate facilities to violate state bribery laws. Significantly, the conviction was based upon evidence that the contract in question had been awarded to plaintiff in return for his promise to pay a kickback to the official in charge of awarding the contract. Upon being sued for the unpaid balance under the contract, the city alleged the illegality of the contract in defense. The Court of Appeals held that since the prior conviction turned upon plaintiff's

---

[13]While there is some authority for granting *quantum meruit* relief where services were rendered in good faith under a contract which failed to meet bidding requirements, *see Hudson City, Co. v. Jersey City Incinerator Authority,* 17 *N. J.* 297, 304–10 (1955); *S. H. Roemer Co., Inc. v. Bd. of Freeholders,* 91 *N. J. Super.* 336, 345 (Law Div. 1966), there is no such assertion here, and hence, such cases are inapposite to the instant facts.

bribery of the public official, it conclusively established the illegality of the contract as a matter of law. As a result, it denied plaintiff's recovery and upheld the city's counterclaim for payments previously made under the illegal agreement, citing considerations of public policy:

The continuing growth of our cities and the expansion of governmental services on all levels has necessitated, over the years, the letting of greater numbers of public contracts. While the amount of money involved in these contracts was relatively small a few decades ago, today the amount is astronomical. It is, therefore, a matter of grave public concern that there be absolute honesty in the procuring of a public contract.

> [344 *N. Y. S.* 2d at 942, 298 *N. E.* 2d at 108, quoting *Jered Contr. Corp. v. New York City Transportation Authority, supra,* 22 *N. Y.* 2d at 192, 292 *N. Y. S.* 2d at 103; 239 *N. E.* 2d at 201]

Often such illegality is based merely upon a failure to conform to bidding requirements. *See Hudson City, Co. v. Jersey City Incinerator Authority,* 17 *N. J.* 297, 305 (1955); *Williston, supra,* at 344; McQuillin, *Municipal Corporations* (3 ed. 1966), § 29.69 at 408. Under the Local Public Contracts Law, *N. J. S. A.* 40A:11–1 *et seq.,* even relatively technical defects in the bidding process will suffice to invalidate a public contract if the deviation from bidding specifications creates the *potential* for favoritism or corruption. *L. Pucillo & Sons, Inc. v. Borough of New Milford,* 73 *N. J.* 349, 356, 357 (1977); *Terminal Const. Corp. v. Atlantic Cty. Sewerage Auth.,* 67 *N. J.* 403, 410 (1975); *Hillside Tp. v. Sternin,* 25 *N. J.* 317, 324–26 (1957). Since public policy mandates such a drastic remedy for irregularities in the procedural safeguards against corruption, we can hardly imagine that a lesser remedy should be available to the public entity where there are demonstrated instances of illegality — the very evils with which we have been most concerned in dealing with public contracts. Indeed, we think that the only arguable question is whether restitution by the plaintiff would not also be justified under these circumstances. *See S. T. Grand, Inc. v. City of New York, supra.*

We need not deal at length with plaintiff's assertion that the instant contract should be upheld because the illegality "concerns only the *motives* which prompted John V. Kenny to recommend or direct the award of the contract to Manning or which prompted the County to make that award." This argument was adequately answered by Chief Justice Vanderbilt, writing for the majority in *Driscoll v. Burlington-Bristol Bridge Co., supra*:

> In order to hold the transaction here involved against public policy and therefore illegal, it is not necessary that there be a showing that the . . . purchase was in fact unwise and unprofitable. Ordinarily it is not the judicial function to pass upon the wisdom or the profitableness of such transactions, that being under most circumstances the legitimate function of the public bodies to which such matters have been delegated by the Legislature, . . . . It is the potential for evil and not the actual financial loss or other injury incurred that renders a transaction illegal because of an abuse of discretion, . . . . *It is sufficient, therefore, that it be proven that the board of chosen freeholders and the bridge commission which it created abnegated their positions of public trust and the duties imposed upon them by law by failing to exercise their discretion in good faith and on fair and intelligent consideration free from corrupting influences.*
>
> [8 *N. J.* at 477, emphasis added]

Similarly, we find that the public contract in question here was awarded to Manning in an atmosphere which was permeated with "corrupting influences."

For the same reasons we refuse to accept Manning's defense that his arrangement with Kenny was sufficiently "collateral" or "remote" to the contract with the county so that the corruption inherent in the former should not be deemed to taint the latter. See 6A *Corbin on Contracts* (1962) pp. 784–85. There is a certain surface logic in the contention. While it is clearly inferable that Kenny recommended Manning for the park contract, there is nothing illegal about that in and of itself. It is not inferable that Kenny's recommendation was known to defendants to be the *quid pro quo* for participation by Manning in other activities for Kenny of an illegal nature. Manning was and had been a public

official and was known as a competent engineer, and the defendants could well have engaged him for this work independent of any recommendation by Kenny.

In his discussion of "collateral" or "remote" illegal transactions, Corbin recites *Restatement, Contracts* § 597, as follows:

'A. bargain collaterally and remotely connected with an illegal purpose or act is not rendered illegal thereby if proof of the bargain can be made without relying upon the illegal transaction.' In the Comment thereto it is said: 'How closely a bargain must be connected with an illegal purpose in order to make the bargain illegal is a question of degree. * * * The line of proximity varies somewhat according to the gravity of the evil apprehended.'

[*Id.* at 785, n. 62]

We believe the last sentence of the quoted Comment is the key to the instant problem. The gravity of the evil apprehended here is trafficking in the award of public contracts, enhanced in this case by the scurrilous nature of Manning's services to Kenny which brought him this contract. The "evil" is thus of first-level "gravity." In this regard, Judge Freund wrote, in *Driscoll v. Burlington-Bristol Bridge Co.,* 10 *N. J. Super.* 545, 575 (Ch. 1950), mod. 8 *N. J.* 433 (1952), cert. den. 344 *U. S.* 838, 73 *S. Ct.* 25, 97 *L. Ed.* 652 (1952), as follows:

The efficiency of the public service is a matter of vital concern to the public. All agreements which tend to introduce personal influence and solicitation as elements in procuring and influencing action by any department of the government are contrary to sound morals, lead to inefficiency in the public service and are illegal. "Any contract which contemplates conduct which will amount to imposition upon a public officer in the exercise of his discretion, is void. * * *."

Manning's argument of collateralness would carry weight if he were free of moral culpability in the matter, for instance, if he were an innocent subcontractor under the engineering contract. *Cf. Jones v. Gabrielan,* 52 *N. J. Super.* 563, 572 (App. Div. 1958). But his own moral turpitude in

the arrangement with Kenny cannot be excised from that transaction when it is considered that his performance thereof was the *quid pro quo* which brought him a recommendation for the park contract with defendants. In such a situation, the innocence of defendants in awarding him the contract is of no avail to Manning. In circumstances of this nature, the doctrine of collateralness must give way to the public policy of discouraging such illegal activities as those admitted by Manning and found below on adequate proofs to have led directly to the award of the instant contract to his firm.

## IV.

### *CONCLUSION*

We have no doubt that the contract in this case served as an award to Frank G. Manning for the various illegal acts which he performed over a period of years for John V. Kenny. Manning's own admissions of his participation in an ongoing scheme to extract kickbacks from contractors, some of whom were his friends, is clear. Moreover, we reject Manning's belabored attempt to explain away his prior admissions of the link between the contract in question and this illegal role.

While such practices are abhorrent and clearly deserving of criminal sanctions, our primary concern today is to prevent a fraud upon the public. Because the contract is so fraught with corruption, illegality and favoritism, we hold that Manning is barred from recovery under it.

The judgment recovered by the plaintiff is vacated.

*For vacating judgment*—Chief Justice HUGHES, Justices MOUNTAIN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.