448 F.3d 573
 BETH ISRAEL MEDICAL CENTER, Lenox Hill Hospital, Montefiore Medical Center, NYU Hospitals Center, The New York and Presbyterian Hospital, The New York Eye and Ear Infirmary, New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery, St. Luke's-Roosevelt Hospital Center, Saint Vincent's Hospital of New York, and Staten Island University Hospital Plaintiffs-Appellants,
v.
HORIZON BLUE CROSS AND BLUE SHIELD OF NEW JERSEY, INC., Defendant-Appellee.
Docket No. 04-5783-CV.
 United States Court of Appeals, Second Circuit.
 Argued: October 19, 2005.
 Decided: May 19, 2006.
 
 COPYRIGHT MATERIAL OMITTED Roy W. Breitenbach (Fredrick I. Miller, Andrew Zwerling, of counsel), Garfunkel, Wild & Travis, P.C., Great Neck, NY, for Plaintiffs-Appellants.
 Kimberly C. Lawrence, Hinman Straub P.C., Albany, NY, for Defendant-Appellee.
 Before: KEARSE, MINER, and HALL, Circuit Judges.
 Judge KEARSE dissents in part in a separate opinion.
 MINER, Circuit Judge.
 
 
 1
 Plaintiffs-appellants appeal from a summary judgment entered October 20, 2004, in the United States District Court for the Eastern District of New York (Amon, J.) dismissing their claims for breach of contract, breach of a third-party contract, unjust enrichment, and engaging in a pattern of deceptive practices in an action brought to secure reimbursement for hospital services rendered. The District Court dismissed plaintiffs' claims for breach of contract after determining that (i) NEW YORK PUBLIC HEALTH LAW § 2807-c completely abrogated the parties' pre-existing written contracts; (ii) all parties were performing under implied-in-fact contracts; (iii) those implied-in-fact contracts were illegal under § 2807-c; (iv) all parties were equally at fault for non-compliance with § 2807-c; and (v) it would not invoke its equitable powers to apply the rates set by § 2807-c to the implied-in-fact contracts. The District Court dismissed plaintiffs' claims for unjust enrichment on the ground that it was "not against `equity and good conscience'" for plaintiffs to have been paid as they were. The District Court also determined that plaintiffs could not establish claims for breach of a third-party contract or for engaging in a pattern of deceptive practices.
 
 BACKGROUND
 I. Factual History
 
 2
 Defendant-appellee Horizon Blue Cross Blue Shield of New Jersey ("Horizon") is a non-profit health services insurance plan based in New Jersey and is affiliated with numerous Blue Cross Blue Shield Plans around the country ("Blue Cross Plans"). Because of this affiliation, Horizon has paid for treatments that its subscribers receive from hospitals associated with Blue Cross Plans in other states pursuant to an agreement called the Blue Cross Inter-Plan Bank Agreement (the "Inter-Plan Agreement"). Since the 1950s, by virtue of the Inter-Plan Agreement, subscribers of Horizon and its predecessor have received treatment from various hospitals in the New York City area that were under contract with the New York Blue Cross Plan, which is now known as Empire Blue Cross and Blue Shield ("Empire").
 
 
 3
 In addition, since the 1950s, Horizon has had Contracting Hospital Agreements ("CHAs") directly with some New York Hospitals. During the 1960s and 1970s, Horizon entered into CHAs with eight of the plaintiff-appellant hospitals: Beth Israel Medical Center, Lenox Hill Hospital, New York Eye and Ear Infirmary, New York Presbyterian Hospital, NYU Hospitals Center, St. Luke's-Roosevelt Hospital, St. Vincent's Hospital of New York, and Staten Island University Hospital. Plaintiffs-appellants The Hospital for Special Surgery and Montefiore Medical Center never entered into CHAs with Horizon. Lenox Hill terminated its CHA with Horizon on June 8, 1995. All other CHAs were terminated on December 31, 1996. Pursuant to the CHAs, the hospitals rendered services to subscribers of Horizon and the hospitals were reimbursed by Horizon.
 
 
 4
 The CHAs used by Horizon are standard forms drafted by employees of Horizon. The CHAs governed the relationship between Horizon and the hospitals as to many specific topics: types of services to be rendered by the hospitals, rate of payment, limitations of actions, notices of hospital admissions and eligibility for services, disposition of charges for ineligible services, effect of prior agreements, termination, availability of medical and financial records, confidentiality, and choice of governing law. The choice-of-law provision specified that the agreements would "be deemed made in and shall be construed according to the Laws of the State of New Jersey." The limitation of actions provision recited that "[n]o action at law or in equity shall be maintainable for any claim arising out of this Agreement unless brought within one year from the date when the cause of action accrued." As to the rate of payment, the CHAs provided that payment by Horizon to the party-hospital would be according to "the formula entitled `Basis of Payment.'" The "Basis of Payment" formula provided for a per diem payment rate "equal to the finally established per diem rate payable to Hospital by the Associated Hospital Service of New York...." Thus, the CHAs permitted Horizon to reimburse the party-hospital at the same rate that the Associated Hospital Service, and later Empire, reimbursed the party-hospital.[1]
 
 
 5
 In 1988, the New York legislature amended the hospital rates legislation popularly known as the New York Prospective Hospital Reimbursement Methodology (the "NYPHRM"). As amended, the NYPHRM mandated that "[p]ayments to general hospitals for inpatient hospital services provided to persons who are not eligible for payments as beneficiaries of .. . (medicare) shall be determined pursuant to this section." N.Y. PUB. HEALTH LAW § 2807-c(1) (1988).[2] The NYPHRM also provided that "[s]pecial payment rate methodology agreements other than those permitted in accordance with the provisions of paragraphs (a) and (b) of this subdivision shall not be authorized ...." Id. § 2807-c(2)(c). The NYPHRM established a mandatory system of reimbursement with three tiers. The first tier rate was established for payments made by state governmental agencies or by "article forty-three corporations,"[3] including Empire, and was designated the "Standard Rate." Id. § 2807-c(1)(a). The Second tier related to payments made for hospital services pursuant to the workers' compensation law, volunteer firefighters' benefit law, the comprehensive motor vehicle insurance reparations act, or by certain self-insured funds. Id. § 2807-c(1)(b). In this tier, the rate was set at the Standard Rate plus thirteen percent and was designated the "Commercial Rate." See id. The rate for the third tier, governing all other payments, was set at the lower of the hospitals' actual charges or 120% of the Commercial Rate. Id. § 2807-c(1)(c). The third tier rate was known as the "Self-Pay Rate." Payments made by out-of-state health plans were subject to the Self-Pay Rate.
 
 
 6
 The NYPHRM also contained a "Foreign Blue Cross Exception." The Foreign Blue Cross Exception permitted out-of-state non-profit health plans, like Horizon, to pay at the Standard Rate rather than the Self-Pay Rate. N.Y. PUB. HEALTH LAW § 2807-c(1)(a) (including in the Standard Rate tier those payments by "article forty-three corporations" "on behalf of subscribers of a foreign corporation as described in paragraph (d) of subdivision twelve of this section"). To be eligible for the Foreign Blue Cross Exception, the out-of-state health plan had to meet three conditions: First, the out-of-state health plan had to be a member of the Blue Cross Blue Shield Association. Id. § 2807-c(12)(d). Second, the law of the state where the out-of-state Blue Cross member was formed had to permit a New York Blue Cross member to pay for services to its subscribers at hospitals in that state at the same rate as the out-of-state Blue Cross member paid to those hospitals. Id. Third, an article forty-three corporation had to act as payment agent. Id. § 2807-c(1)(a).
 
 
 7
 It is undisputed that from the amendment of the NYPHRM in 1988 until December 31, 1996, the latest date relevant to this action, Horizon reimbursed the plaintiff-appellant hospitals at a rate equal to the Standard Rate, rather than the Self-Pay Rate.
 
 II. Procedural History
 
 8
 This action was commenced by the filing of a Complaint on July 7, 1998. At some later date not clear in the Record, an Amended Complaint was filed dismissing two of the original plaintiff hospitals, The New York Methodist Hospital and Westchester Square Medical Center, and adding two of the plaintiff-appellant hospitals, The New York Eye and Ear Infirmary and The New York Society for the Relief of the Ruptured and Crippled, Maintaining the Hospital for Special Surgery. A Second Amended Complaint also was filed. The Second Amended Complaint, like the initial Complaint, sought damages equal to the difference between the amounts the plaintiff-appellant hospitals (the "Hospitals") contended that Horizon should have paid under the Self-Pay Rate and the amounts that Horizon did pay under the Standard Rate for the period from January 1, 1991 through December 31, 1996. The Hospitals did not sue under the NYPHRM; they conceded in the District Court that "they have no private right of action under the statute." Instead, the Hospitals asserted claims sounding in (i) breach of contract; (ii) breach of third-party contract; (iii) unjust enrichment; and (iv) engaging in a pattern of deceptive practices. After discovery, the parties cross-moved for summary judgment. In an unpublished Memorandum and Order dated August 31, 2004, the District Court granted summary judgment to Horizon, denied summary judgment to the Hospitals, and dismissed the Hospitals' Complaint "in its entirety."
 
 
 9
 The District Court first determined that the NYPHRM "overrode the pre-existing contracts" between Horizon and the Hospitals and abrogated them completely. Accordingly, the District Court found that the choice-of-law provisions in the CHAs were irrelevant, that New York law governed the parties' relationships, and that the NYPHRM "governed the rates of reimbursement" to the Hospitals during its existence. As to whether Horizon was entitled, under the Foreign Blue Cross Exception, to pay the Standard Rate, the District Court determined that were some contested issues of material fact. The District Court determined that those hospitals subject to a CHA — all except the Hospital for Special Surgery, Montefiore, and, after June 8, 1995, Lenox Hill — were paid directly by Horizon, which therefore was ineligible for the benefits of the Foreign Blue Cross Exception as to the CHA-covered hospitals. As to the excepted three hospitals, the District Court determined that Horizon was a Blue Cross member and that New Jersey law provided the "reciprocal option," thus satisfying two of the three requirements of eligibility for the Foreign Blue Cross Exception. However, the District Court determined that "it [was] not clear whether all payments were made through Empire [as payment agent] or whether some were made directly." Thus, the District Court decided that summary judgment was unwarranted in favor of Horizon or any of the excepted three hospitals with respect to the Foreign Blue Cross Exception.
 
 
 10
 Because the District Court found that the NYPHRM completely abrogated the contracts upon its enactment, it determined that all parties had been "performing pursuant to implied contracts." The District Court also found that, during the course of this implied-in-fact contractual relationship, "all parties were performing pursuant to the [payment] terms of the abrogated contracts" without objection and applying by analogy "the law governing the performance of illegal contracts," concluded that it would "leave the parties as [it found] them."
 
 
 11
 The District Court further concluded that the Hospitals were not third-party beneficiaries of insurance policies between Horizon and its subscribers because the contracts between Horizon and its subscribers did not "provide any specifics as to how much the hospitals will be paid" and because there was no evidence suggesting that Horizon had ever promised its subscribers "that it would pay more than it actually paid" to the Hospitals. The District Court also dismissed the Hospitals' claims for unjust enrichment. The District Court determined that it was "not against `equity and good conscience'" for Horizon to pay the Hospitals "at the New York Blue Cross Rates when [the Hospitals] accepted those rates without protest for several years." See Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir.2000) ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." (internal quotation marks omitted)). Indeed, the District Court determined that "the unjust result would be to allow [the Hospitals] to recover after silently accepting payment for eight years." Finally, the District Court determined that the Hospitals could not show that Horizon's conduct was deceptive and dismissed their claim for deceptive practices.
 
 
 12
 Judgment was entered on October 20, 2004. The Hospitals timely filed an amended notice of appeal on November 8, 2004. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.
 
 ANALYSIS
 I. Standard of Review
 
 13
 The standard of review of a district court's grant of summary judgment is a familiar one. A district court's grant of summary judgment is reviewed de novo. Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 492 (2d Cir.1999). This Court "utilizes the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998). A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir.1997). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir.1987). This Court reviews a district court's interpretation of a contract de novo. Lee v. Bsb Greenwich Mortgage L.P., 267 F.3d 172, 178 (2d Cir.2001). Questions of law or mixed questions of fact and law are reviewed de novo. Hirschfeld v. Spanakos, 104 F.3d 16, 19 (2d Cir.1997). This Court may "affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." Leecan v. Lopes, 893 F.2d 1434, 1439 (2d Cir.), cert. denied, 496 U.S. 929, 110 S.Ct. 2627, 110 L.Ed.2d 647 (1990).
 
 II. Contract Claims
 A. CHA Claims
 
 14
 The parties disagree as to whether the NYPHRM applies to the relationships between Horizon and those hospitals subject to CHAs, given the CHAs' choice of law provision for the application of New Jersey law. Horizon argues that New Jersey law governs the application of the CHAs, that nothing in New Jersey law would abrogate any part of the CHAs, and, therefore, that the CHAs should be enforced as written. Horizon specifically argues that the reimbursement rates provided by the CHAs, with which it complied, have not been abrogated and therefore that it did not breach its contracts. The Hospitals argue, conversely, that New York law governs the application of the CHAs and that the NYPHRM abrogated the CHAs completely. Specifically, the Hospitals argue that the CHAs' rate of reimbursement, choice of law, and limitation of actions provisions have been abrogated and are not enforceable. The District Court determined that the NYPHRM applied to the CHAs and abrogated them completely, thereby determining that the choice of law provision was "irrelevant" and, by implication, that the limitation of actions provision also was irrelevant. We need not address the question of whether New York or New Jersey law applies to the CHAs, for, whichever law applies, the CHAs' limitation of actions provisions are enforceable and all claims arising under the CHAs must be dismissed.
 
 
 15
 New Jersey law provides that "courts should enforce contracts as made by the parties." Vasquez v. Glassboro Serv. Ass'n, Inc., 83 N.J. 86, 101, 415 A.2d 1156, 1164 (N.J.1980). Although New Jersey law provides that a contract is "unenforceable where it is held to be contrary to public policy," Manning Engineering, Inc. v. Hudson County Park Comm'n, 74 N.J. 113, 138, 376 A.2d 1194, 1207 (N.J.1977), Horizon asserts that nothing in the CHAs is contrary to New Jersey public policy and that this Court must enforce the CHAs as written. The Hospitals have not argued to the contrary and this Court is unaware of any public policy of New Jersey that would preclude enforcement of the CHAs. Accordingly, under New Jersey law, this Court would enforce the one-year limitation for bringing claims arising under the CHAs.
 
 
 16
 Under New York law the analysis is slightly different, but the result is the same. New York law provides that this Court must enforce contract provisions clearly expressing the intent of the parties. See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (N.Y.2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." (citations omitted)). Contracts for an illegal purpose or contrary to public policy are not enforceable. See 64th Associates, L.L.C. v. Manhattan Eye, Ear & Throat Hosp., 2 N.Y.3d 585, 589-90, 780 N.Y.S.2d 746, 813 N.E.2d 887 (N.Y.2004). ("Ordinarily, courts are not involved in the oversight or approval of contracts and will enforce them unless illegal, against public policy or deficient in some other respect."). Where part of a contract is contrary to public policy, and therefore unenforceable, a court may nevertheless enforce the remainder of the contract. See BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (N.Y.1999) (enforcing portions of a restrictive covenant where another portion of the covenant was overbroad and unenforceable as contrary to public policy); Triggs v. Triggs, 46 N.Y.2d 305, 413 N.Y.S.2d 325, 385 N.E.2d 1254 (N.Y.1978) (enforcing legal provisions of a corporate shareholder agreement containing illegal provisions); Ferro v. Bologna, 31 N.Y.2d 30, 334 N.Y.S.2d 856, 286 N.E.2d 244 (N.Y.1972) (holding that a provision of a separation agreement that was of questionable legality did not vitiate the entire agreement and the other provisions of the agreement may be valid and enforceable); see also Restatement (Second) of Contracts § 184(1) (1981) ("If less than all of an agreement is unenforceable [on grounds of public policy], a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreements is unenforceable is not an essential part of the agreed exchange.").
 
 
 17
 The NYPHRM provided that "special payment rate methodology agreements other than those permitted in accordance with the provisions of paragraphs (a) and (b) of this subdivision shall not be authorized." N.Y. PUB. HEALTH LAW § 2807-c(2)(c). This is a clear statement of New York public policy. The at-issue CHAs present valid provisions governing the relationship between Horizon and the partyhospitals, covering such topics as types of services to be rendered by the hospitals, limitations of actions, notices of hospital admissions and eligibility for services, disposition of charges for ineligible services, effect of prior agreements, termination, availability of medical and financial records, confidentiality, and choice of governing law. Contrary to the District Court's view, the NYPHRM does not abrogate the CHAs in toto but only the part that contravenes New York public policy. Nothing in the NYPHRM purports to interfere with the parts of the CHAs that are not "special payment rate methodology agreements," and the balance of the CHAs remain valid and enforceable.
 
 
 18
 This action seeks to recover on claims that accrued between January 1, 1991 and the expiration of the pertinent NYPHRM rate structure on December 31, 1996. Nothing in NYPHRM abrogates the CHAs' limitation of actions provision that "[n]o action at law or in equity shall be maintainable for any claim arising out of this Agreement unless brought within one year from the date when the cause of action accrued," and that provision must be enforced according to its clear and unambiguous language. The original Complaint was filed on July 7, 1998, well after the one-year limitation period provided in the CHAs would have run for any accrued claim. Accordingly, all claims arising from the CHAs must be dismissed as untimely brought.
 
 B. The Implied-in-Fact Contract Claims
 
 19
 With regard to the claims of the hospitals without CHAs — Montefiore, the Hospital for Special Surgery, and Lennox Hill after June 8, 1995 — a different analysis applies. Both Horizon and these three hospitals seem to agree that their relationships were based on implied-in-fact contracts. However, the District Court considered the CHAs abrogated in their entirety and treated Horizon and all the Hospitals as if they were subject to implied-in-fact-contracts. We proceed to analyze the implied-in-fact contract claims insofar as they relate to the hospitals without CHAs.
 
 
 20
 Under New York law, the conduct of the parties may lead to the inference of a binding agreement:
 
 
 21
 A contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the presumed intention of the parties as indicated by their conduct. It is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct.
 
 
 22
 Jemzura v. Jemzura, 36 N.Y.2d 496, 503-04, 369 N.Y.S.2d 400, 330 N.E.2d 414 (N.Y. 1975) (internal citations omitted). New Jersey law provides the same: "[C]ontracts implied in fact are no different than express contracts, although they exhibit a different way or form of expressing assent than through statements or writings. Courts often find and enforce implied promises by interpretation of a promisor's word and conduct in light of the surrounding circumstances." Wanaque Borough Sewerage Auth. v. Twp. of W. Milford, 144 N.J. 564, 574, 677 A.2d 747, 752 (N.J.1996) (citing Restatement (Second) of Contracts §§ 4 cmt. a, 5 cmt. a (1979)). The terms of an implied-in-fact contract turn on the conduct of the parties. See Watts v. Columbia Artists Mgmt. Inc., 188 A.D.2d 799, 801, 591 N.Y.S.2d 234 (3d Dep't 1992) (citing Jemzura, 36 N.Y.2d at 503-04, 369 N.Y.S.2d 400, 330 N.E.2d 414). The conduct of the parties in this case demonstrates that the implied-in-fact contract terms called for reimbursement at the equivalent of the Standard Rate, inasmuch as payments were made and accepted without objection at that rate.[4] This Court also must look to the conduct of the parties to determine whether the implied-in-fact contract terms include either a limitation of action provision or a choice of law provision, as did the CHAs. On the Record before us, we cannot say that the parties' course of conduct provides any evidence of the adoption of such specific terms. This Court must therefore determine whether New York or New Jersey law applies to these claims and the effect of that law.
 
 
 23
 i. The Choice of Law
 
 
 24
 A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Gilbert v. Seton Hall Univ., 332 F.3d 105, 109 (2d Cir.2003). Here, the forum state is New York, as the action was properly venued in the United States District Court for the Eastern District of New York. We therefore apply New York choice of law analysis.
 
 
 25
 The New York Court of Appeals has held that "the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993); see also Zurich Ins. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994). In this case the answer to that inquiry clearly is yes. Under New York's NYPHRM, these hospitals were entitled to a greater rate of reimbursement from Horizon than under New Jersey law, which permitted Horizon to enter contracts to pay these hospitals at reduced rates.
 
 
 26
 The New York Court of Appeals has held, in contract cases, that the "center of gravity" or "grouping of contacts" analysis is to be applied in choice of law situations. Stolarz, 81 N.Y.2d at 226, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). The "center of gravity" or "grouping of contacts" choice of law theory allows a court to consider a "spectrum of significant contacts." Stolarz, 81 N.Y.2d at 225-26, 597 N.Y.S.2d 904, 613 N.E.2d 936. In Stolarz, the New York Court of Appeals listed several factors which should be considered in a conflict of law analysis in a contract case. These factors include "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." Id. at 227, 597 N.Y.S.2d 904, 613 N.E.2d 936 (citing Restatement (Second) of Conflict of Laws, § 188(2) (1971)). Given these factors, we determine that New York law should apply to these implied in-fact-contracts. The most significant contacts here were the rendering of hospital services in New York, the billing by the Hospitals in New York, and the New York domicile of all the Hospitals. law. We note moreover that New York has an important interest in maintaining the viability of hospitals in the state through the setting of appropriate rates. See Zurich Ins. Co., 84 N.Y.2d at 317, 618 N.Y.S.2d 609, 642 N.E.2d 1065 ("The purpose of grouping contacts is to establish which State has `the most significant relationship to the transaction and the parties.'" (quoting Restatement (Second) of Conflict of Laws § 188(1) (1971))).
 
 
 27
 ii. The NYPHRM Applied
 
 
 28
 Horizon argues that, in the event this Court determines that New York law governs these contracts, the NYPHRM did not "affect any right which had accrued prior to its enactment" and, therefore, that Horizon's pre-NYPHRM contracts (whether express or implied-in-fact) were unaffected by the NYPHRM. The basis of this argument can be found in the session law enacting the NYPHRM. Section twenty-four of that session law (chapter two), dealing with effective dates and retroactivity of the NYPHRM, provides: "This act shall not be construed to alter, change, affect, impair or defeat any rights, obligations, duties or interests accrued, incurred or conferred prior to the enactment of this act." 1988 N.Y. Sess. Laws 44 (McKinney).
 
 
 29
 The District Court rejected this argument, determining that the statutory language of the NYPHRM demonstrated that
 
 
 30
 [t]he legislature clearly intended to set the rates of payment from [the point of NYPHRM's enactment] forward and did not intend to exclude pre-existing contracts with foreign insurers from the statute. Rather, the legislature was simply trying to ensure that any costs that accrued prior to January 1, 1988 [the effective date of the rate provisions, see 1988 N.Y. Sess. Laws 44 (McKinney)] were not subject to the terms of the statute. Thus, [Horizon] is not exempt from the terms of the NYPHRM because of the Alteration [C]lause.
 
 
 31
 We agree with the rationale and conclusion of the District Court. Neither section twenty-four, nor any other provision of the NYPHRM, insulates these implied-in-fact contracts from the effects of the NYPHRM.
 
 
 32
 iii. The Doctrine of Illegality Misapplied
 
 
 33
 The District Court determined that the NYPHRM rate structure was not part of any implied-in-fact contract. First, the District Court noted that it had not been provided "any authority . . . for the proposition that [a court] should read the rates of the statute into an implied[-in-fact] contract where both parties were clearly not performing according to the statute." Second, the District Court found that the NYPHRM "clearly gave [the Hospitals] the right to demand higher rates of reimbursement, but it did not create a new implied[-in-fact] contract because the parties did not agree to the terms." The District Court therefore determined that the implied-in-fact contracts contained payment terms "rendered illegal by the passage of [the] NYPHRM" and analogized them to illegal contracts that could not be enforced by any party.
 
 
 34
 But this analogy is misplaced. The contracts at issue were not illegal in their subject matter or in their purpose. Cf. Stone v. Freeman, 298 N.Y. 268, 271, 82 N.E.2d 571 (N.Y.1948) ("It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose." (citations omitted)). Instead, as with the CHAs, these are otherwise legitimate contracts that have been abrogated in part by a statute. In such cases, New York courts enforce those portions of the contracts that are not abrogated and apply the relevant statute to those abrogated portions. In Metropolitan Life Ins. Co. v. Conway, 252 N.Y. 449, 169 N.E. 642 (1930), for example, Chief Justice Cardozo, writing for the Court of Appeals, held that where an insurance policy rider was not approved by the New York Superintendent of Insurance, as required by New York Insurance Law, "the rider is not invalid ipso facto unless in conflict with the provisions exacted by the statute. It is invalid even then to the extent of the conflict, and no farther. The statute reads itself into the contract, and displaces inconsistent terms." Id. at 451-52, 169 N.E. 642 (emphasis added). Accordingly, the NYPHRM provides the relevant rates of reimbursement for these implied-in-fact contracts.
 
 
 35
 iv. The Foreign Blue Cross Exception
 
 
 36
 The District Court determined, as to the three hospitals not subject to a CHA, that summary judgment was unwarranted in regard to the claims that invoked the Foreign Blue Cross Exception. The District Court properly found contested issues of material fact regarding the extent to which Horizon used Empire as a payment agent, an element essential to a resolution of the Foreign Blue Cross Exception claims. See Fed.R.Civ.P. 56(c). We therefore must remand for further proceedings in relation to the implied-in-fact contract claims. We express here no opinion as to the District Court's conclusions as to the other two necessary elements of Horizon's eligibility for the Foreign Blue Cross Exception.
 
 
 37
 v. Waiver
 
 
 38
 Horizon argues that, assuming it breached its contracts by not paying at the Self-Pay Rate, any breach has been waived by the Hospitals because they accepted the payments that it made "without objecting or reserving any rights."[5] A breach of contract may be waived by the non-breaching party. See New York Tel. Co. v. Jamestown Tel. Corp., 282 N.Y. 365, 372, 26 N.E.2d 295 (N.Y.1940). See generally 22A N.Y. Jur.2d Contracts §§ 369, 430 (1996). The New York Court of Appeals has held that waiver of a contract right "is the voluntary abandonment or relinquishment of a known [contract] right. It is essentially a matter of intent which must be proved." Jefpaul Garage Corp. v. Presbyterian Hosp., 61 N.Y.2d 442, 446, 474 N.Y.S.2d 458, 462 N.E.2d 1176 (1984) (citations omitted); Nassau Trust Co. v. Montrose Concrete Products Corp., 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (1982) ("[W]aiver requires . . . the voluntary and intentional abandonment of a known [contract] right which, but for the waiver, would have been enforceable." (citation omitted)); see also Champion Spark Plug Co. v. Automobile Sundries Co., 273 F. 74, 79-80 (2d Cir.1921) ("Waiver [of a contract right] depends upon the intention of the party who is charged with the waiver. It is an intentional abandonment or relinquishment of a known right or advantage.").
 
 
 39
 Because waiver of a contract right must be proved to be intentional, the defense of waiver requires a "clear manifestation of an intent by plaintiff to relinquish her known right" and "mere silence, oversight or thoughtlessness in failing to object" to a breach of the contract will not support a finding of waiver. Courtney-Clarke v. Rizzoli Intern. Publications, Inc., 251 A.D.2d 13, 676 N.Y.S.2d 529 (1st Dep't 1998); see also Champion Spark Plug Co., 273 F. at 79 ("Oversight, carelessness, or thoughtlessness will not create a waiver. There must appear to be an intention to relinquish the right or advantage, and it must be proved."). "[T]he intent to waive is usually a question of fact . . . ." Jefpaul Garage Corp., 61 N.Y.2d at 448, 474 N.Y.S.2d 458, 462 N.E.2d 1176; see also Champion Spark Plug Co., 273 F. at 80 ("So much depends upon the intention of the parties that, where such intent is disputed, it necessarily becomes a question for the determination of a jury.").
 
 
 40
 The Hospitals first argue that, no matter their intent, the doctrine of waiver is inapplicable here because "the statutorily mandated rate under NYPHRM was not subject to waiver by the Hospitals." The Hospitals recognize, as they must, that any statutory or constitutional right ordinarily may be waived. However, the Hospitals point to the "broad spectrum of public policies" underlying NYPHRM's enactment and argue that "it was not in the power of the Hospitals to frustrate the will of the Legislature either expressly or impliedly or through an alleged waiver or acquiescence." See Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707, 65 S.Ct. 895, 89 L.Ed. 1296 (1945) ("Neither petitioner nor respondent suggests that the right to the basic statutory minimum wage could be waived by any employee subject to the [Fair Labor Standards] Act. No one can doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act."); see also Garofalo v. Empire Blue Cross and Blue Shield, 67 F.Supp.2d 343, 347-48 (S.D.N.Y.1999) (finding that the NYPHRM "gives the insurer no discretion to vary this methodology, nor to contract around it").
 
 
 41
 The hospitals next argue that, in any event, no waiver can be found under the facts of this case. On the Record before us, there has been no express waiver of the hospitals' rights to greater recompense. There has, of course, been evidence that the hospitals never previously objected to the rate of reimbursement they were receiving, see supra note 4, but we cannot determine that this failure to object, as a matter of law, effects a waiver. See Jefpaul Garage Corp., 61 N.Y.2d at 448, 474 N.Y.S.2d 458, 462 N.E.2d 1176 ("[T]he intent to waive is usually a question of fact . . . ."); Courtney-Clarke, 251 A.D.2d at 13, 676 N.Y.S.2d 529 ("The requisite clear manifestation of an intent by plaintiff to relinquish her known right to the royalty rate in the publishing agreement is not inferable, under the circumstances, from her mere silence, oversight or thoughtlessness in failing to object to the lower royalty rate she had been receiving, and thus the defense of waiver was properly dismissed." (citation omitted)); see also Champion Spark Plug Co., 273 F. at 79-80 (holding that waiver of a contract right is generally a question for the jury). Accordingly, and in view of the posture in which this issue comes to us, we must remand to the District Court to resolve issues related to the defense of waiver in the first instance.
 
 
 42
 vi. Statute of Limitations
 
 
 43
 New York law provides a six-year statute of limitations period for implied-in-fact contract claims. N.Y. C.P.L.R. § 213(2). As previously noted, this action sought recovery for claims accrued between January 1, 1991, and December 31, 1996. The initial Complaint was not filed until July 7, 1998, so at least some of these claims are barred by the statute of limitations. Moreover, the Hospital for Special Surgery was not added as a plaintiff until a later date still. Accordingly, on remand, the District Court will have to determine, in the first instance, which claims are timely and which are not.
 
 III. Unjust Enrichment
 
 44
 The Record makes clear the Hospitals' claims of unjust enrichment have been made "in the alternative" to their contract claims. In support of their cross-motion for summary judgment and in opposition to Horizon's motion for summary judgment the Hospitals argued to the District Court that
 
 
 45
 [i]f this [c]ourt determines that no contractual relationships exist between the Hospitals and Horizon — which it should not — the Hospitals are still entitled to summary judgment because Horizon's payment to the Hospitals at rates far lower than those permitted by New York law constitutes unjust enrichment as a matter of law.
 
 
 46
 Thus, Horizon recognized that the court should treat the claims for unjust enrichment only if it first determines that no contractual relationships exist between Horizon and the hospitals. Because we have determined, as the Hospitals insisted that we should, that contractual relationships did exist between Horizon and the Hospitals, the unjust enrichment claims must be dismissed.
 
 
 47
 Cases dealing with unjust enrichment in New York are uniform in their recognition of three elements of the claim: "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." E.g., Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir.2000) (internal quotation marks omitted). It is important to note, however, the nature of an unjust enrichment claim in New York: "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." Goldman v. Metropolitan Life Ins. Co., 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 841 N.E.2d 742 (N.Y.2005) (citations omitted; emphasis added). As the New York Court of Appeals has explained:
 
 
 48
 The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter. A "quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment. . . . Briefly stated, a quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved . . . .
 
 
 49
 Of course, a party may perform a contract under protest, and then sue for damages resulting from the second party's breach. Alternatively, where rescission of a contract is warranted, a party may timely rescind and seek recovery on the theory of quasi contract. It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.
 
 
 50
 Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388-89, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) (internal citations omitted).
 
 
 51
 Thus, under New York law, those hospitals subject to CHAs clearly may not recover under a theory of unjust enrichment, inasmuch as the valid and enforceable written CHAs governed the particular subject matter of this case.
 
 
 52
 Claims of unjust enrichment by the three hospitals that were not subject to CHAs must also be dismissed. Because, as noted above, "in the law there is no distinction between agreements made by words and those made by conduct," and implied-in-fact contracts are "just as binding as [] express contract[s] arising from declared intention," Jemzura, 36 N.Y.2d at 504, 369 N.Y.S.2d 400, 330 N.E.2d 414, Clark-Fitzpatrick precludes unjust enrichment claims whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact. See Jim Longo, Inc. v. Rutigliano, 294 A.D.2d 541, 742 N.Y.S.2d 877 (2d Dep't 2002) (reversing a jury verdict in favor of the plaintiff on "a theory of quasi-contract" because a performed oral contract precluded any such claim (citing, inter alia, Clark-Fitzpatrick)); Bello v. Cablevision Systems Corp., 185 A.D.2d 262 (2d Dep't 1992) (holding that an implied-in-fact contract precluded a claim for "quasi-contract" (citing, inter alia, Clark-Fitzpatrick)). As we have determined that valid, enforceable implied-in-fact contracts existed between Horizon and each of the three at-issue hospitals and that these contracts governed the particular subject matter of this case, the unjust enrichment claims of the at-issue hospitals are precluded. Cf. Nakamura v. Fujii, 253 A.D.2d 387, 677 N.Y.S.2d 113 (1st Dep't 1998) (in case involving purported oral contract, recognizing that existence of oral contract would "preclude[ ] quasi-contractual recovery," but holding that where "a bona fide dispute exists as to the existence of the contract, the plaintiff may proceed on both breach of contract and quasi-contract theories" (citing, inter alia, Clark-Fitzpatrick)).
 
 
 53
 In accordance with the foregoing, all claims for unjust enrichment are dismissed as precluded under New York law and inconsistent with the Hospitals' own pleadings because we have found valid, enforceable contracts between Horizon and the Hospitals.
 
 IV. Other Claims
 
 54
 We have considered the Hospitals' third-party beneficiary and deceptive practices claims and find them meritless for the same reasons as did the District Court.
 
 CONCLUSION
 
 55
 For the foregoing reasons we affirm in part and vacate in part the judgment of the District Court and remand for further proceedings consistent with the foregoing. Specifically, the District Court is directed to determine: whether any timely claims were made for breach of implied-in-fact contract by Montefiore, the Hospital for Special Surgery, and Lennox Hill (after June 8, 1995); whether, if so, any of the three hospitals waived any benefit to which they were otherwise entitled; and, if no waiver is found, whether Horizon was entitled to the benefit of the Foreign Blue Cross Exception as to claims made by any of the three hospitals. The District Court is further directed to fix the amount of any claim deemed meritorious in accordance with these directions.
 
 
 
 Notes:
 
 
 [1]
 The Associated Hospital Service of New York is the predecessor of EmpireSee State of New York Insurance Department, Report on Examination of the Empire Blue Cross and Blue Shield as of December 31, 1999, 3 (Nov. 6, 2002) ("[Empire] is the direct successor to Associated Hospital Service of New York (`AHS')."), available at http://www.ins.state.ny.us/exam_rpt/embcbs99.pdf.
 
 
 [2]
 All citations to N.Y. PUB. HEALTH LAW § 2807-c(1) contained herein are to the 1988 version of that lawSee 1988 N.Y. Sess. Laws 11-39, 44 (McKinney) (adding section 2807-c, retroactive to Jan. 1, 1988); 1988 N.Y. Sess. Laws 1169-72 (McKinney) (amending section 2807-c to add Foreign Blue Coss Exception, retroactive to Jan. 1, 1988).
 
 
 [3]
 The term "article forty-three corporations" refers to non-profit New York based health plans regulated under Article 43 of the New York Insurance Law
 
 
 [4]
 The Hospitals have produced declarations claiming that "underpayments" under the NYPHRM "are solely the responsibility of Horizon" because "[b]ills issued during NYPHRM listed the standard charges for [h]ospital services, and all third-party payors were required to know at what level they should reimburse the [h]ospital pursuant to NYPHRM." [A 238;see also A 250] Nevertheless, it is undisputed that, during the period that the NYPHRM was in effect, the Hospitals never objected to the rate of reimbursement they were receiving. [See Blue 39]
 
 
 [5]
 The Hospitals assert that they "were not given an opportunity to make an evidentiary showing on this issue . . . because the lower court ruled on this issue without input or briefing by the parties." The District Court did not explicitly address the issue of waiver, though portions of its decision addressing the Hospitals' having "accepted each of [Horizon's] payments without questioning whether or not they complied with the [NYPHRM]" over the course of eight years could be read that way
 
 
 
 56
 KEARSE, Circuit Judge, dissenting in part.
 
 
 57
 I respectfully dissent from the majority opinion in several respects. First, I disagree that a hospital that had a written Contracting Hospital Agreement ("CHA") with defendant or its predecessors (collectively "Horizon" or the "Plan") is barred from recovery by the contractual one-year limitations period specified in the CHA. Second, I disagree (a) that a plaintiff hospital that had no written contract with Horizon had an implied-in-fact contract calling for payments at the rate mandated by the 1988-1996 legislation known as the New York Prospective Hospital Reimbursement Methodology ("NYPHRM"), and (b) that such rights as those hospitals had to receive payment at the NYPHRM-mandated rate could be waived. In my view, NYPHRM abrogated the CHAs, and there were no implied-in-fact contracts calling for payments at the NYPHRM-mandated rate; however, I believe that plaintiffs' claims in quantum meruit should not have been summarily dismissed to the extent that they accrued within six years of the commencement of the present action.
 
 
 58
 A. The Upholding of the Contractual Limitations-Period Provision
 
 
 59
 I agree with the majority that NYPHRM abrogated the payment provisions of the CHAs. NYPHRM provided, with exceptions not pertinent here, that "[s]pecial payment rate methodology agreements . . . shall not be authorized, and no other arrangements with a general hospital for inpatient rates of payment other than those established in accordance with this section shall be negotiated." N.Y. Pub. Health Law § 2807-c(2)(c). As the majority notes, this section constituted "a clear statement of New York public policy." Majority Opinion ante at 12. Because the CHAs allowed Horizon to pay New York hospitals at a lower rate than that permitted by NYPHRM § 2807-c(1)(c), the CHAs were contrary to public policy. I disagree with the majority's view, however, that the CHA was a severable contract from which the provision for payment could be excised leaving the limitations-period provision enforceable.
 
 
 60
 As the majority opinion recognizes, see ante at 581, it is established that "[i]f less than all of an agreement is unenforceable [on grounds of public policy], a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange." Restatement (Second) of Contracts § 184(1) (1981) (emphasis mine). However, the latter condition is not satisfied in the present case, for Horizon's payment to the hospital was an essential part of the agreed exchange. Indeed, it was the entire essence of the CHA: The only substantive promise Horizon made to the hospitals was to pay them.
 
 
 61
 The majority opinion instead views the CHA—a 3-page, 12-paragraph form document created by Horizon—as dealing with "many . . . topics":
 
 
 62
 The CHAs governed the relationship between Horizon and the hospitals as to many specific topics: types of services to be rendered by the hospitals, rate of payment, limitations of actions, notices of hospital admissions and eligibility for services, disposition of charges for ineligible services, effect of prior agreements, termination, availability of medical and financial records, confidentiality, and choice of governing law.
 
 
 63
 Majority Opinion ante at 576. But every one of the substantive topics covered in the CHA concerned payment.
 
 
 64
 For example, the CHA did not govern the types of services "to be rendered" by the hospitals or a patient's eligibility for services; rather, it governed only the types of services for which — for Horizon subscribers—Horizon agreed to pay. Thus, the CHA defined "eligible persons" to "mean[ ] such persons as are entitled to eligible hospital services" as Plan subscribers, and it defined "eligible hospital services" to "mean[ ] such hospital services as Plan has contracted to provide payment for eligible persons." (CHA ¶ 1.B. (emphasis added).)
 
 
 65
 Similarly, notice of an admission to the Hospital was required only with respect to services "purporting to be eligible for payment by the Plan under this Agreement." (Id. ¶ 4.) The CHA's termination paragraph made provision for payment for past "eligible hospital services" and the continuation of current "eligible hospital services." (Id. ¶ 7.) And medical records were required to be made available only as they "pertain[ed] to claim determination." (Id. ¶ 8.)
 
 
 66
 Aside from imposing a duty to keep patient information confidential, the remainder of the CHA consists of provisions that are merely procedural. (See id. ¶ 3 (one-year limitation period for lawsuits); id. ¶ 10 (choice of law); id. ¶ 11 (where to send notices of termination); and id. ¶ 12 (CHA paragraph headings not to be deemed controlling as to contract meaning).) In my view, the contractual limitations-period provision cannot survive the invalidation of the payment provision, for if there had been no provision for Horizon to make payments to the hospitals, there would have been no contract at all.
 
 
 67
 Given that the agreement for payment is invalid, I would conclude that the district court ruled correctly that the CHAs were abrogated in toto.
 
 
 68
 I note in passing my disagreement with Horizon's contention that the CHA provision for payments at a below-NYPHRM-mandated rate should be upheld on the theory that New Jersey law does not require payment at the NYPHRM rate and the CHAs provided that New Jersey law should apply. The plaintiff hospitals were domiciled in New York; they treated patients in New York; and NYPHRM sought to protect the New York hospitals' viability. The New York hospitals and those who dealt with them could not defeat New York's interest in the public welfare or override the statute implementing it, by the simple expedient of agreeing among themselves that they would be governed by New Jersey law.
 
 
 69
 I agree with the district court's rejection of plaintiffs' contention that once the CHAs were overridden by the statute, the parties were performing pursuant to implied contracts. The district court correctly ruled that a contract may be implied in fact from the presumed intention of the parties as indicated by their conduct, see, e.g., Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 376 n. 5 (2d Cir.2000), but that there is no indication here that the parties intended that Horizon would pay the hospitals at the rate mandated by NYPHRM.
 
 
 70
 However, given the invalidation of the express contracts and the absence of any implied-in-fact contracts, I see no doctrinal impediment to plaintiffs' pursuit of claims in quasi contract, or quantum meruit. See generally Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co., 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987) (a claim in quasi-contract or quantum meruit is normally not available where a valid and enforceable agreement exists between the parties). The district court dismissed the quantum meruit claims here on the ground that there was no injustice because plaintiffs accepted the below-NYPHRM-mandated rate without protest for eight years. This seems to me an unduly narrow view of what is just, especially given that NYPHRM sought to further "New York['s] . . . important interest in maintaining the viability of hospitals in the state through the setting of appropriate rates," Majority Opinion ante at 584 n. 5, and that the hospitals' viability is, in turn, critical to the availability of adequate medical treatment for the people of and in New York. I do not believe the quantum meruit claim was susceptible to summary judgment in favor of Horizon simply on the basis of the hospitals' failure to commence this action sooner.
 
 B. Implied-in-Fact Contracts and Waiver
 
 71
 I also disagree with the majority's view that the hospitals that did not have written contracts with Horizon may be found to have waived their right to payment at the rate mandated by NYPHRM. The majority's premise is that "valid, enforceable implied-in-fact contracts existed" between Horizon and the plaintiff hospitals that did not have written contracts, see Majority Opinion ante at 587; and it notes that contract rights may be waived, see, e.g., id. at 585 ("waiver of a contract right is the voluntary abandonment or relinquishment of" such a right (internal quotation marks omitted) (emphasis added)); id. ("waiver of a contract right must be proved to be intentional" (emphasis added)).
 
 
 72
 I disagree with the majority's premise. I do not see in the parties' words or conduct a basis for imputing to Horizon and any of the hospitals that accepted Horizon's rate an intention that Horizon would pay the NYPHRM-mandated rate.
 
 
 73
 Thus, it seems to me that the hospitals' right to payment at the rate mandated by NYPHRM was not a contract right; it was a right conferred by statute. As discussed above, that statute sought to further New York's interest in maintaining the fiscal viability of its hospitals in order to ensure the availability of adequate medical treatment for persons in New York. My view is that the right to be paid at a rate that was statutorily mandated in the interest of public welfare, i.e., for purposes beyond that of merely filling hospital coffers, could not be waived. Indeed, the view that the hospitals that had no written contracts with Horizon may permissibly be found to have waived their rights to the NYPHRM-mandated payment rate if their actions were knowing, voluntary, and intentional would seem to be inconsistent with this panel's unanimous view that the lower-than-NYPHRM-mandated rate actually agreed to in writing by the hospitals that entered into CHAs cannot be enforced.
 
 
 74
 In sum, my view is that all of the plaintiffs' claims based on contracts, express or implied, were properly dismissed. But given the statutory landscape, the court should not have granted summary judgment dismissing their claims for quantum meruit.
 
 
 75
 Claims in quantum meruit in New York are subject to a six-year statute of limitations. See N.Y. C.P.L.R. § 213(1). Accordingly, I would vacate the judgment to the extent that it dismissed plaintiffs' quantum meruit claims and would remand for the adjudication of those claims to the extent that they accrued within the six-year period prior to the commencement of the present action.